WESTCHESTER COUNTY.—HON. OWEN T. COFFIN, SURROGATE.—November, 1885.

### PORTEUS *v.* HOLM.

*In the matter of the application for probate of a paper propounded as the will of* CATHARINE SHAFFER, *deceased.*

It must be deemed a settled doctrine in this State, that—where a testator produces a paper to which he has already personally subscribed his name, and *exhibits the same so subscribed* to another, with a request that the latter sign it as a witness, at the same time declaring it to be his last will and testament,—he virtually acknowledges his signature, and effects a due publication, as to such witness, within the meaning of the statute of wills (2 R. S., 63, § 40).

*It seems*, that, where an attestation clause intervenes between the proper provisions of a will and the sole subscription of the testator's name, such subscription may be regarded as made "at the end of the will," so as to satisfy the requirement of the statute in this particular.

An attestation clause, which contains a conceded misstatement of fact as to one subscribing witness to a will, and not a word of which was read by, or to the other, cannot be resorted to by a proponent, to prop up a case weakened by the frailty of the witnesses' memory, respecting the formalities of execution.

*It seems*, that it is not essential to show that a request, made by a decedent, to a subscribing witness to an alleged will of the latter was, in terms, to sign *as a witness*, where the circumstances warranted such an interpretation of the request.

Upon an application for the probate of a paper propounded as the will of decedent, it appeared that there were several blank spaces in the body of the instrument, large enough to permit the insertion of disposing clauses without interlineation, and, at the end, for the signature of decedent, and the date of execution. Decedent's name, with the suffix, "Adm'x," was subscribed only once, viz.: at the end of an attestation clause, which recited that the testatrix subscribed in the presence of each witness, and in such presence declared the instrument to be her last will. The only credited testimony, relative to publication, was that of the two subscribing witnesses, of whom the first testified that decedent came to his store, and presented to him the paper, so folded that he could see no part of the writing except the last line of the attestation clause, to wit, "our names hereto as witnesses this            day of            1882," which he did not read, and asked him to "witness her signature," which she wrote in his presence, and then departed, expressing the intention of visiting the other witness for a like purpose. The second witness recognized his signature as genuine, but recollected nothing.—

*Held*, that probate must be refused, for want of proof of an acknowledgment, by decedent, to the first witness, of the testamentary character of the instrument.

The testimony, in favor of the proponent of a contested will, given by one named as a legatee therein—weighed, and found wanting in credibility.

A PAPER, intended for a last will and testament, was prepared and came into the hands of the decedent at some time in 1882. There were several blank spaces in the body of it, sufficiently large to permit the writing of disposing clauses without interlineations, and a space at the end of the paper for the signature. Spaces were also left for the insertion of the day, month and year, which remained unfilled. Then followed an attestation clause, thus: "Subscribed by the testator in the presence of each of us, and at the same time declared by her to us to be her last will and testament, and thereupon we, at the

request of the testator, sign our names hereto as witnesses this    ·    day of    1882."
which was signed

> " Catharine Shaffer, adm'x.
> J. M. Dearborn, Mt. Vernon.
> John Berry, Mt. Vernon, N. Y."

The paper so executed was propounded for probate by Charles F. Holm, one of the persons named as executors therein.   John Berry, one of the witnesses, testified that decedent came into his store with a paper in her hand, so folded that he could see no part of the writing, except the last line of the attestation clause, " and asked me if I would witness her signature, and she made her signature in my presence and asked me to witness it," which he did; and then she said she must go in to see Mr. Dearborn and get him to do the same thing.   Mr. Dearborn's store was a few doors from Mr. Berry's, and he was not present when the paper was signed by Mrs. Shaffer.   Berry could not remember that Mrs. Shaffer said it was her last will and testament, but if she had, thought he would have remembered it.   Mr. Dearborn, the other witness, had no recollection whatever on the subject, but admitted the genuineness of his signature.   Both of them had acted as witnesses to a will of the decedent in 1878, the circumstances attending the execution of which they recollected.   Subsequently, Mary A. King, a servant of the decedent, to whom a legacy of $200 had been given by the alleged will, testified that she accompanied the decedent to the stores of the respective witnesses, and that the decedent substantially asked Mr. Berry if he would sign her will

and testament, to which he assented; that she and the decedent then went to Mr. Dearborn's store, and asked him to sign her will.

CHAS. F. HOLM, *in person, and* ISAAC N. MILLS, *of counsel.*

JACOB FROMME, *for George W. Shaffer, husband.*

CHAUNCEY SHAFFER, *for Louisa Porteus and another, heirs.*

J. H. M. PORTER, *for Kate M. Penrose, heir.*

W. M. SKINNER, JR., *guardian ad litem for infant heir.*

THE SURROGATE.—The contestants insist that the will was not properly executed, taking the statements of Mrs. King to be true, because the testatrix did not acknowledge her signature to Dearborn, one of the witnesses, who did not see her sign her name, and cite, on this point, the case of Mitchell v. Mitchell (16 *Hun*, 97). There "the deceased came into the store where the two witnesses were, and handed out a paper, and said: 'I have a paper that I want you to sign.' One of them took the paper and partly opened it, and saw what it was. The witness, probably, from his testimony saw the signature. The testator said 'this is my will; I want you to witness it.' Then the two witnesses signed the paper under the attestation clause. It does not appear that the other witness saw the testator's signature. The testator then took the paper and said: 'I declare this to be my last will and testament.' At the time of this transaction, the paper had the name of the deceased at the end of the paper. But the witnesses did not

see him sign, nor was there any acknowledgment by him of his signature in their presence, unless the facts above stated are such acknowledgment." The court held that there was no acknowledgment of the signature to either of the witnesses, and rejected the will. This decision was affirmed in 77 *N. Y.*, 596, but by a divided court.

In Chaffee v. Bapt. Miss. Conv. (10 *Paige*, 85), the testatrix, who had subscribed the will by making her mark, but not in the presence of the attesting witnesses, " afterwards, and in their presence, placed her finger on her name and said : 'I acknowledge this to be my last will and testament.'" It was held that the will was not well executed. This is approved in the case of Willis v. Mott (36 *N. Y.*, 486). It is difficult to see any distinction between the case of the putting of the finger upon the name with the mark, and declaring it to be her last will and testament, and that of a presentation of a paper with the testatrix's signature written by her at the foot of it, with a declaration that it is her last will and testament. I am satisfied, on the whole, that the decision in the case of Mitchell v. Mitchell required that more should be done than merely requesting the witnesses to subscribe their names to a paper with the name of the alleged testator at the end of it, which he says is his last will and testament. By doing so, he complies with only two of the three distinct requirements of the statute. The other one, that he shall sign it in their presence, or acknowledge that he has signed it, is equally distinct and imperative with the others, and, in the absence of proof that he did one or the

other, the requirements of the statute have not been complied with, to render it a valid testamentary act. But, in the case of Baskin v. Baskin (36 *N. Y.*, 416), it was held to be a sufficient acknowledgment of the testator's signature where he produces a paper, to which he has personally affixed his name, and requests the witnesses to attest, and declares it to be his last will and testament, and that, in so doing, he does all that the law requires.  This doctrine seems to be distinctly affirmed in the Matter of Will of Phillips (98 *N. Y.*, 267).  (Curiously, it appears from the Surrogate's report of the case, in 3 *Dem.*, 459, that the testator *did* acknowledge his signature to both the witnesses, Skinner and Beach, during his conversation with each of them.  And see Rumsey v. Goldsmith, 3 *Dem.*, 494).  Hence, although the reasoning of Judge LEARNED, in the case of Mitchell v. Mitchell, may seem the stronger, the result reached in 98 *N. Y.*, is controlling here, and, assuming that the paper was executed and properly attested in the presence of one witness, and presented to the other so executed, and attested by him, then, if the testimony of Mrs. King is to be regarded as true, it might be held that it was well executed as a will.

But I am unable to bring my mind to a belief of her credibility.  She and Mr. Berry are in conflict, as to their statements of the transaction.  He is one of the leading business men in Mount Vernon ; a man of character, intelligence, and large experience in affairs ; and the same may be said of Mr. Dearborn : while Mrs. King had, for many years, been a servant, a part of the time, in the family of the deceased ;

could neither read nor write; and was named as a legatee in the alleged will, to the extent of $200. Mr. Berry's statement of the circumstances is, substantially, this—The deceased came to his store alone, and asked him if he would witness her signature, to which he assented. She then produced a paper so folded that only one line of the writing could be seen, to wit, " our names hereto as witnesses this day of , 1882," and of which he did not read a word, and signed her name. He signed his, and thinks she requested him to write his place of residence after it, which he did. She then said she must go and get Mr. Dearborn to do the same thing, and left his store. There was nothing said by her, to impress his mind with the fact that it was an important document. He thinks if she had said it was a will he should have remembered it. She was there only two or three minutes. Under these circumstances, it seems to me highly improbable that he was informed of the nature of the instrument, and it was not at all unlikely that a person unfamiliar with the manner of the execution of a will, as the deceased was, as is shown by her signing her name at the foot of the attestation clause, and appending to it the abbreviation, " adm'x," should have omitted to state what the paper was, especially in her anxiety to conceal its contents, as manifested by her.

Mr. Dearborn, the other witness, had no recollection of the matter whatever, but recognized his signature, which was written above Mr. Berry's, apparently for lack of room below it, and, although he

knew both Mrs. Shaffer and Mrs. King, he did not remember ever seeing them in his store together.

After the lapse of a month from the examination of these witnesses, Mary A. King was produced as a witness, and was objected to as incompetent, because named as a legatee, to testify concerning any transaction or communication between herself and the deceased. Her examination, however, was conducted in such a manner as to avoid the objection. She testified only to conversations in which she took no part, and which had no relation to any transaction between her and the deceased. She was engaged in cleaning house for the deceased, when the latter asked her to go with her to Mr. Berry's store, as she wanted to see him. It was but a short distance to the store, and was, as she states, between two and three o'clock in the afternoon. It strikes me as a singular proceeding for a lady to take a servant from her work at that hour, to accompany her, for no apparent reason. She says she went into the store with deceased, " and she shook hands with Mr. Berry, and asked him if he would sign her will and testament. He asked her if she were going to die, and she said, ' no.' Then he said, ' I will sign it.' So he went with her up to the desk." She says they were there twenty or twenty-five minutes (Mr. Berry says not more than two or three), and she, witness, was buying ruffling for deceased. They then went to Mr. Dearborn's, where deceased " asked him to sign her will, and he kind of laughed, and asked, ' have you come with the will ?' and she said, ' certainly.'" They then went back to the desk, while the witness bought some salad dress-

ing.   They were at Dearborn's twenty-five or thirty minutes.   This witness, when asked to whom she had communicated these facts, for some time insisted that she had told them to no person whatever, but, after much questioning, admitted that she had, to her law-yer ; who proved to have been not hers but her son's, but she claimed that he was her lawyer in this pro-ceeding.   She finally, after denying that she had done so, acknowledged that she had also told them to another counsel in the case.   Taking into considera-tion all the facts detailed—the material interest which the witness has at stake, evidenced by her having engaged counsel to look after it, her alleged recollec-tion of conversations, which, had they occurred, would have so impressed the minds of the intelligent gentlemen who signed the paper, that they would not have been readily forgotten, and who, after much reflection, are unable to recall anything of the kind, leads me to place no credence in the testimony of Mrs. King.

It is a pregnant and important fact that Mr. Berry and Mrs. King differ very materially, in reference to what both profess to recollect well.   The former says the deceased requested him to *witness her signature ;* the latter says she asked him *to sign her will and testament.*   Both statements cannot be true.   One witness is surely in error, and I feel constrained to believe Mr. Berry.   Mrs. King professes to give all of the conversation, and she does not state that Mrs. Shaffer requested Mr. Berry to witness her signature. The two statements are conflicting and cannot be re-conciled ; nor can one be taken as evidence of a pub-

lication, and the other of a request to sign as a witness, thus, together, making a valid execution. According to her evidence, neither of the witnesses was asked by the deceased to sign her will *as a witness.* That, perhaps, was not essential, provided the circumstances warranted the inferring of such request. But, relying upon the testimony of Mr. Berry, it must be held that there was no publication of the instrument as a will, and it must, therefore, be rejected.

No reference has been made to the attestation clause, as an aid in the solution of this matter, as it was manifestly untrue as to one of the witnesses, and the other one declares that he did not read a word of it. . . . . .

The evidence supplied by the attorney who drew the will, the object of which was to show that the deceased knew the character of the paper, and which was objected to as incompetent under § 835 of the Code, has been disregarded by me as wholly immaterial. The deceased was an intelligent lady, and it can hardly be assumed that she did not know the nature and contents of the paper she took to Mr. Berry's store; besides, such knowledge is shown, on her part, by the testimony of Harry Skidmore.

An order must be entered, denying probate of the paper offered as a will, with costs to proponents and contestants out of the fund, to be taxed.